## SKINNER et al. v. REYNOLDS METALS CO.

No. 689.

District Court, W. D. Kentucky, Louisville Division.

Dec. 31, 1946.

Francis R. Harbison, of Pittsburgh, Pa., and Leo T. Wolford, and Bullitt & Middleton, all of Louisville, Ky., for plaintiffs.

W. Lee Helms, of New York City, Edward P. Humphrey, of Louisville, Ky., and W. S. D. Woods, of Richmond, Va., for defendant.

MILLER, Circuit Judge (sitting by designation).

The plaintiffs, C. D. Skinner and Leo C. Bradley, brought this action to recover from the defendant, Reynolds Metals Company, the sum of $127,627.95 with interest for royalties on the production by the defendant of extruded aluminum products under a contract between the parties of October 26, 1936, by which the plaintiffs assigned to the defendant certain patents together with future inventions for the improvement of methods in the extrusion of metals. They also pray for an account-

ing for the period subsequent to November 27, 1943. The defendant claims that the contract and liability for royalties was terminated on September 23, 1943; that a part of its production of extruded metals prior to that date was not through use of plaintiffs' patents or subsequent inventions and were not covered by the contract, and that it has overpaid the plaintiffs the amount of $5,626.49, for which it seeks judgment against the plaintiffs by way of counterclaim. The parties also differ as to the proper construction of the royalty provisions of the contract as subsequently amended by mutual agreement.

### Findings of Fact

1. The plaintiff C. D. Skinner is a citizen and resident of Pennsylvania; the plaintiff Leo C. Bradley is a citizen and resident of Kentucky; the defendant Reynolds Metals Company is a corporation created under the laws of the State of Virginia, and is engaged in business in Louisville, Kentucky. The suit is of a civil nature, and the matter in controversy exceeds exclusive of interest and costs the sum of $3,000.

2. The plaintiffs Skinner and Bradley were, prior to October 25, 1936, engaged as employees of the Aluminum Company of America in the art of extruding aluminum metal, and had approximately twenty years experience in said business. They were also the owners of the majority of the capital stock of The Hollow Extrusion Specialty Company, a Pennsylvania corporation, engaged in the extrusion of metals with a small plant it had erected in Springdale, Pennsylvania.

3. On or about October 26, 1936, Skinner and Bradley entered into a written contract with Robertshaw Thermostat Company (hereinafter called Robertshaw), a wholly-owned subsidiary of Reynolds, which provided in part as follows:

Skinner and Bradley agreed to enter the employ of Robertshaw on or prior to November 1, 1936, and to continue in its employ until November 1, 1939. During the period of employment they were to devote their entire time, skill and attention diligently to the employment and to perform such services as were delegated to them by Robertshaw, primarily in the extrusion of metals. Robertshaw agreed to pay each of them a salary of $350 per month. Skinner assigned to Robertshaw letters patent No. 1847365, granted on March 1, 1932 for an improvement in the extrusion of metals, of which Skinner was the owner. Skinner and Bradley jointly assigned to Robertshaw certain inventions which they had perfected and for which applications for patents either had been made or would be made in the near future, and also such future inventions as they might during the course of their employment perfect, either as new inventions or as improvements to present or future inventions for the improvement in the present methods in the extrusion of metals. They also agreed to make applications for patents for on such new inventions or improvements and to assign the patents when and if obtained to Robertshaw.

Robertshaw agreed to pay to Skinner and Bradley in equal shares royalties for the life of patents covered thereby on all extrusion products "made in accordance with or embodying the inventions disclosed in any such patent, including dies manufactured and sold by it or by any of its present or future subsidiary or affiliated companies" as follows:

No royalties were to be paid on products manufactured and sold prior to May 1, 1937. Commencing with May 1, 1937, the royalties to be paid for each 12-month period were to be the following percentages of the net sales, invoices, towit: On sales not exceeding One Million Dollars ($1,000,000) one per cent; on sales exceeding One Million Dollars ($1,000,000) and not exceeding Two Million Dollars ($2,000,000) three-fourths of one per cent; on all sales in excess of Two Million Dollars ($2,000,000) one-half of one per cent; provided, however, that commencing with May 1, 1937, and annually thereafter the minimum annual royalty was to be $5,000, whether the percentage of the sales equalled that sum or not. The contract covered inter-company sales and the sales made by sub-licensees, provided, however, that Robertshaw was not to be liable for royalties due from sub-licensees unless such royalties were received by it. Rob-

ertshaw was obligated to render annually, within 60 days after each annual period, a statement of the sales made under the provisions of the contract upon which royalties were to be computed. The contract also provided as follows:

"The party of the second part may terminate its obligation to pay royalty hereunder at any time by discontinuing the extrusion of metals under and by means of the processes, patents and devices of the parties of the first part, and the reassignment to them jointly or severally, as they may have been the patentees of patents and/or applications assigned by them to the party of the second part under the terms of this agreement and by the assignment also unto the parties of the first part of any license agreements made by the party of the second part."

4. Following the execution of the contract Robertshaw elected, as provided by the contract, to take an assignment and transfer of all the assets of Hollow Extrusion Specialty Company, which transfer was duly made on or before July 21, 1936. At approximately the same time Skinner and Bradley entered into the employ of the defendant, as provided by the contract. About December 1937 Robertshaw suggested to Skinner and Bradley a modification of the $5,000 minimum royalty provision of the contract. Following a verbal understanding in the matter, Skinner and Bradley wrote to Robertshaw under date of December 24, 1937, which letter provided in part as follows:

"We understand and agree that no minimum royalties shall become due and payable under the agreement to us until on or after May 1st, 1939, it being our intention to relinquish any claim for minimum royalties due under the agreement until the said 1st day of May, 1939, and the said agreement mentioned shall be considered by us and by you as modified to this extent.

"We further understand that, in accordance with our verbal understanding made with you, in consideration of the waiver of minimum royalties until the date mentioned, we will be paid the actual royalties due under the agreement upon a percentage basis in monthly instalments rather than in annual instalments. We understand that the monthly payments of actual royalties due under the agreement will be, of course, computed on a monthly basis rather than sixty (60) days following the lapse of the annual period, as provided in the agreement.

"Excepting for the change and modification with regard to the waiver of minimum royalties and the payment of the actual royalties upon a percentage basis in monthly instalments, as we have stated herein, our agreement of October 26th, 1936, is not otherwise changed in any respect."

Under date of December 27, 1937, Robertshaw wrote to Skinner and Bradley acknowledging receipt of the letter and reading as follows:

"The change and modification, as therein set out, is an accurate statement of our verbal understanding with relation to the modification of the agreement of October 26, 1936, and, in consideration of your waiver until May 1, 1939 of the payment of minimum royalties as provided in said agreement, we, in turn, agree that the actual royalties, to become due thereunder, shall become due and be computed and paid to you monthly thereafter."

Under date of March 1, 1938, Skinner on behalf of himself and Bradley wrote The Robertshaw Thermostat Company another letter which contained the same paragraphs quoted above from their letter of December 24, 1937 with the exception of the date being changed from May 1, 1939 to May 1, 1940. Under date of May 27, 1939, Robertshaw wrote to Skinner and Bradley as follows:

"This will acknowledge receipt of your letter of March 1, 1939, amending your agreement with us dated October 26, 1939. Your letter correctly sets forth our understanding of the matter."

5. Under the terms of the contract of October 26, 1936, Robertshaw had the right to assign the same, and such right was exercised by Robertshaw assigning the contract to the defendant Reynolds Metals Company prior to April 17, 1939. On April 17, 1939, Skinner and Bradley,

at the request of Robertshaw, wrote Robertshaw consenting to the assignment.

6. Both Robertshaw and the defendant Reynolds Metals Company were inexperienced in the art of extruding metals. Skinner and Bradley, in the employ of Robertshaw and under its instruction, devoted their time to the operation of the Springdale plant and experimenting in the development of processes for extrusion of aluminum articles up and until the fall of 1939. Reynolds Metals Company desired to engage in the business of extruding metals and abandoned the Springdale plant and in the fall of 1939 transferred its operations to what was known as Plant No. 1 on Hale Street in Louisville, Kentucky, to which it transferred Skinner and Bradley. Skinner and Bradley designed and adapted its interior for the operation of extrusion presses, installed such presses and operated said plant for the commercial extrusion of aluminum articles upon a profitable basis. Reynolds Metals Company decided to build and equip a much larger plant for said purpose and instructed Skinner and Bradley to design such a plant with the necessary equipment, which they did, and Reynolds Metals Company proceeded with its erection and equipment. It was located at Fourth and Montana Streets in the City of Louisville, Kentucky, and was known as Plant No. 8. Before the completion thereof, on or about September 1940, Reynolds Metals Company entered into a contract with the Defense Plant Corporation, a United States Government wholly-owned agency, whereby Reynolds Metals Company sold said Plant No. 8 to the Defense Plant Corporation. Under the contract Reynolds Metals Company operated the plant and erected and equipped an extensive addition.

7. Bradley continued his employment with Reynolds Metals Company under the contract of October 26, 1936, until he was discharged by the Reynolds Metals Company on May 22, 1941. Skinner continued his employment with the Reynolds Metals Company under the contract of October 26, 1936, until he resigned on July 15, 1941.

8. Contemporaneous with its expansion of its manufacturing facilities, Reynolds Metals Company was producing extruded articles under the contract of October 26, 1936, and paid Skinner and Bradley the royalties reserved under said contract, as amended, computed at one percent on the monthly sales of extruded products. These sales for 1940 amounted to $1,238,000. Such payments were made until February 20, 1941, when Reynolds Metals Company contended that Skinner and Bradley had been overpaid for the year 1940 in that when the sales for that year totaled $1,000,000 the payments should have been calculated on the additional $238,000 at three-fourths of one percent instead of one percent, although the sales did not total $1,000,000 in any one month. Following correspondence during March 1941 between Skinner and Bradley and Redford, who was an accountant in the employ of Reynolds Metals Company, the Reynolds Metals Company acquiesced in the contention of Skinner and Bradley that the amendments to the original contract changed the operation and effect of the sliding scale so that it applied to the net sales for each one month period instead of a 12-month period. In acquiescing in this contention Redford secured the approval of Arthur, who was the Comptroller of the Reynolds Metals Company. Neither Redford nor Arthur was expressly authorized to make contracts for Reynolds Metals Company, nor to modify or change the terms of any existing contracts, or the terms of the contract of October 26, 1936. The plaintiffs had no knowledge of the actual extent of the authority of Redford or Arthur or of any limitation of the authority of either of them to take the action which was so taken by them with respect to the contract in question. Thereafter payments were continued to be made by Reynolds Metals Company to Skinner and Bradley at the one percent rate for each month regardless of whether or not the total sales for the 12-month period exceeded $1,000,000, until July 1942. About that time the question came to the attention of other and superior officers of Reynolds Metals Company who requested and received the opinion of the Company's counsel that the interpretation of the contract by Redford and Arthur was not cor-

rect and that monthly payments should be made on the reduced royalty basis whenever the net sales in any 12-month period exceeded $1,000,000. Skinner and Bradley did not agree with this contention, and thereafter beginning with July 1942 monthly payments were calculated and paid at the one percent rate until total sales for the twelve months period totaled $1,000,000 and thereafter at the reduced rate for the remainder of the twelve months period, without prejudice to the rights of either party in the matter.

9. By letter dated March 27, 1940, Extruded Metals, Inc., wrote to Reynolds Metals Company at Louisville, Kentucky, as follows:

"Pending receipt of an agreement from you relative to the manufacture by us of extruded tubing and tube shapes under the Skinner process, this will confirm agreement made with you and Mr. R. S. Reynolds whereby you have licensed us to manufacture tubing and tubular shapes under the Skinner process for a period of at least five years; we to pay you a royalty of 1¢ net per pound on all tubing and tube shapes shipped by us that were manufactured under the Skinner process.

"Pending your own form of agreement or contract, your acknowledgment hereof will be entirely satisfactory for the time being, I am sure."

By letter of April 11, 1940, Reynolds Metals Company, acting through T. A. Lynch, Manager, Sheet and Extrusion Division, wrote to Extruded Metals, Inc., at Belding, Michigan, as follows:

"This will acknowledge your letter of March 27th with reference to license under the Skinner Patents.

"The proposition as outlined in your letter is in accordance with the understanding reached with Mr. R. S. Reynolds and myself.

"We are asking our Legal Department to draw up an agreement for your signature."

10. Skinner and Bradley also installed in the plants of Reynolds Metals Company the following unpatented processes and devices:

(1) Tube stenciling machine.

(2) Squaring and deburring cutters.

(3) Oiling device on draw benches.

(4) Twister device on stretcher straightener.

(5) Adjustable draw die.

(6) Rolls for straightening out-of-shape moldings.

(7) Spiral milling cutter.

(8) Delivery tubes and receiving units to make the Sutton Roll Straightener a one-man operation.

(9) Work drawings showing bearings on extrusion dies.

(10) Work drawings showing shrinkage tolerance.

(11) Heat treating electric furnace.

(12) Lot ticket system.

(13) Swedging tube pointing dies.

(14) Hammers tube pointing dies.

(15) Shape design stretcher jaws—to stretch electric shapes.

(16) One-man operated draw bench.

(17) Tool container on the 2200-ton horizontal Loewy press.

11. Skinner and Bradley devised and installed the entire extrusion plant of the Reynolds Metals Company for all of its extrusion business at Plant No. 1 and Plant No. 8. No extrusion was done by Reynolds Metals Company nor by Robertshaw prior to the contract made between Skinner and Bradley and Robertshaw.

12. Under date of September 21, 1943, the defendant executed, jointly with Robertshaw, a notice of termination of the contract of October 26, 1936 and supplemental agreement thereto, together with a reassignment of the patent rights which it had acquired under the contract. Such notice of termination and assignments were delivered to the plaintiffs on or about September 23, 1943. Receipt thereof was acknowledged by the plaintiffs but they refused to agree to such termination and contended and now contend that the defendant has not complied with the condition precedent to terminate the contract and reassign the Letters Patent.

13. Plant No. 8 was equipped with secondhand vertical presses selected and

adapted by Skinner and Bradley until its sale to the Defense Plant Corporation, when Reynolds agreed to purchase and install therein a new Loewy Horizontal Press. The plaintiff, Skinner, adapted said press to the extent of designing a different die assembly, incorporating a tapered die covered by their Patent No. 2,176,364, and Reynolds continued to operate said press so adapted by Skinner and Bradley until the date of trial, and it admits sales from its production during the period August 1, 1941, to September 23, 1943, of $1,798,961.25. Reynolds paid royalties to Skinner and Bradley upon sales from the production of said Loewy Horizontal Press from the time it was put into operation in August 1941, through November 1941. In January 1942, Reynolds first claimed a deduction from the sales of its Plant No. 8 for all extrusions produced by said Loewy Horizontal Press from the date of its first operation and at all times thereafter on the ground that it did not incorporate any patents of Skinner and Bradley, which deductions were protested by Skinner and Bradley. Skinner and Bradley refused to accept payments involving such deductions until Reynolds agreed they might accept such payments without prejudice to their claims.

14. Reynolds entered into an arrangement with The Extruded Metals Company to extrude rough tubes, known as blooms, for it which were shipped to one or the other of its Louisville plants and finished them in such plant or plants, upon which production it paid Skinner and Bradley royalties at the reserved rate until in January 1942. Sales from such production were $39,969.73. In January 1942, Reynolds first claimed a deduction of all sales made from said Extruded Metals Company blooms furnished to its Louisville plants, which was protested by Skinner and Bradley and subsequent royalty payments were accepted subject to the nonprejudice agreement.

15. Reynolds entered into an arrangement with Extruded Metals Company to fabricate certain orders over the Skinner process which it performed and shipped to the customers and for which Reynolds billed the customers and remitted the proceeds collected less a deduction of 5%. These sales aggregated $106,054.25.

16. The contract provided that sales of extruded products made to associated or subsidiary companies and called "intercompany sales" should be included in sales for royalty computation at the fair market price of such products as established and obtained by Reynolds in the sale of such products to others, and such sales to December 1, 1943, totalled $202,683.84.

17. Reynolds made certain alterations in one or more vertical presses in Plant No. 8, whereby it installed a sling operated by motor to encircle and grasp multiple extrusions from said press or presses which it claimed exempted sales of production therefrom from liability for royalties in the total sum of $328,327.03. The alteration of the said vertical presses was an equivalent which did the same work as the devices and designs of Skinner and Bradley and was admittedly installed to avoid the patented devices of Skinner and Bradley.

18. Reynolds' net sales of extruded products during the period August 1, 1941 to September 23, 1943, exclusive of sales from production of the Loewy Horizontal Press, from Extruded Metals blooms, by Extruded Metals Company and from the rebuilt vertical press or presses, amounted to $12,668,648.16, from interplant transfers $202,683.84 and from die charges $26,096.62, making a total of $12,897,428.62, for which liability for royalty charges is admitted under the contract of October 26, 1936, as amended.

19. Reynolds continued in the business of extruding metals on and subsequent to September 23, 1943, and still continued in said business at the time of trial of this cause in July 1945.

20. Reynolds did not discontinue the extrusion of metals under and by means of the processes, patents and devices of Skinner and Bradley on or prior to September 23, 1943.

21. Reynolds continued the use of the following patents of Skinner and Bradley in the extrusion of metals after September 23, 1943, viz.: The Skinner die or its equivalent covered by Skinner Patent No.

1,847,365; the tapered die and die assembly and the die manipulator claimed or covered by Patent No. 2,176,364; and the vertical press assembly claimed or covered by Patent No. 2,176,365.

22. Reynolds continued the use of the following processes and/or devices of Skinner and Bradley, installed or disclosed to it by Skinner and Bradley for the extrusion of metals in its operations on and after September 23, 1943:

Oiling device on draw benches

Twister device and stretcher straightener

Adjustible draw die

Rolls for straightening out of shape mouldings

Spiral milling cutters

Work drawings showing bearings on extrusion dies

Work drawings showing shrinkage tolerances

Design for heat treating electric furnace

Lot ticket system

Swedging tube pointing dies

Hammer tube pointing dies

Shape design stretcher jaws

One man operated draw bench

23. The so-called Reynolds die and die assembly as disclosed by Reynolds' Exhibits "A" and "B," and dies identified as Exhibits 31 and 32, and used up into 1945, are practically identical with the die designed by Skinner and Bradley for the Robertshaw Thermostat Company in 1937 and they incorporated features covered and claimed as inventions by Skinner and Bradley in their application for Patent No. 2,176,364, which was assigned to the Robertshaw Thermostat Company and patent therefor obtained by it on behalf of Skinner and Bradley under the terms of the contract, and the annular ring or mixing chamber disclosed and claimed in Skinner Patent No. 1,847,365.

24. Reynolds' net sales of extruded products during the period September 24, 1943, to September 30, 1943, amounted to $277,914.77.

25. Reynolds' net sales of extruded products during the period September 30, 1943, to November 30, 1943, amounted to $1,077,962.

26. The Skinner Patent No. 1,847,365 discloses the conception of incorporating an annular ring or mixing chamber in the die assembly between the mandrel die and the female die and all dies used by Reynolds, as disclosed by the evidence, utilized this claim or invention and were equivalents of it if not within the strict words of the patent.

27. The vertical presses described as 3000 ton, 2500 ton and 5000 ton were secondhand presses remodeled and adapted by Skinner and Bradley for extrusion of aluminum and installed in Plant No. 8 and incorporated patented devices covered by Patents Nos. 2,176,364 and 2,176,365 and said devices remained therein up until November 12, 1944.

### Conclusions of Law

1. The original contract of October 26, 1936, provided for royalties at one percent on sales of $1,000,000 or less, and at reduced percentages on sales above that amount, with a minimum annual royalty of $5,000. The successive waivers by the plaintiffs on December 24, 1937, and March 1, 1939, of this minimum royalty until May 1, 1939, and May 1, 1940, respectively provided not only for monthly payments instead of annual payments of the royalties due, but also specifically provided that the royalties were to be "computed on a monthly basis" instead of following the annual period. I do not agree with defendant's contention that the royalties, although thereafter payable monthly, were still to be computed on the annual basis with reduced percentages for the remainder of the year after sales for the year passed the one million dollar point. The wording does not appear ambiguous or reasonably susceptible of such construction. Monthly *basis* is in contrast with annual *basis*. The preceding sentence deals with the *payment* of royalties in monthly installments. The sentence under consideration was unnecessary unless it meant that the basis of computation was to be changed to a monthly one as well as the time of payment being changed. In addition, the parties themselves have so

construed the contract by making payments on the new basis in accordance with plaintiffs' construction of the contract. "The construction of a contract which the parties have given it while operating thereunder, should be followed." Franklin Fire Ins. Co. v. Chesapeake & Ohio R. Co., 6 Cir., 140 F.2d 898, 899. Nor do I agree with defendant's further contention that the monthly method of computation was to remain in effect only for the period during which the minimum royalty was waived. There is no such provision contained in the waivers. The reduced rate of royalty is not applicable except in a month when total sales for that month exceed $1,000,000.

■ 2. The defendant is liable for royalties on the sales of production from the Loewy Horizontal Press, sales from Extruded Metals blooms to it, sales through Extruded Metals and the sales of production from the rebuilt vertical presses. In each of these instances the defendant used the patent covered by the contract or its mechanical equivalent. Royalty fixed by the license may be recovered, not only on the licensed product but on its equivalents as well. St. Paul Plow Works v. Starling 140 U.S. 184, 196, 11 S.Ct. 803, 35 L.Ed. 404. "The range of equivalents covered by the patent corresponds with the character of the invention, and includes all forms which embody the substance of the invention, and by like mechanical co-operation effect substantially the same result." Dowagiac Mfg. Co. v. Brennan & Co., 6 Cir., 127 F. 143, 147; Veneer Machinery Co. v. Grand Rapids Chair Co., 6 Cir., 227 F. 419, 427; Eclipse Bicycle Co. v. Farrow, 199 U.S. 581, 26 S.Ct. 150, 50 L.Ed. 317. In both the case of the Loewy Horizontal Press and in the case of sales from Extruded Metal blooms to the defendant, the defendant paid royalties for a period of time, thus construing the question by their conduct in accordance with the plaintiffs' contention. Compare Franklin Fire Ins. Co. v. Chesapeake & Ohio R. Co., 6 Cir., supra. It is not open to the defendant in this action to contest the validity of the plaintiffs' patents, as it is well settled that a licensee may not dispute the validity of the patent in a suit for royalties. Walker on Patents, 6th Ed. Sect. 355; United States v. Harvey, 196 U.S. 310, 25 S.Ct. 240, 49 L.Ed. 492; Drackett Chemical Co. v. Chamberlain Co., 6 Cir., 63 F. 2d 853.

■■ 3. In order for the defendant to terminate its obligation to pay royalties under its contract with the plaintiffs it was necessary that it not only reassign the patents to the plaintiffs but also that it discontinue the extrusion of metals under and by means of "the processes, patents and devices" of the plaintiffs. The finding is that the defendant has not done this. It attempted to avoid use of the patents by adopting what the Court has found to be merely mechanical equivalents. They were still in use long after September 23, 1943 when it gave its notice of termination. Regardless of the correctness of that ruling the defendant continued to use after the notice of termination some thirteen of the "processes" and "devices" which the plaintiffs had installed in setting up and operating defendant's plant. Defendant's contention that these were not patentable, because of anticipation in the art, and, accordingly could be used by it without liability, does not, even if so established, meet the issue. The contract referred both to patents and to processes and devices. Processes and devices are not necessarily patentable. The long experience of the plaintiffs enabled the defendant to efficiently equip its plant by the installation and use of several processes and devices, which although not patentable by the plaintiffs, yet were valuable additions to the equipment being installed. Under the contract in question the defendant bought this experience and is required to continue to pay for it as long at it uses it. The business world is filled with examples of efficiency experts in particular types of businesses commanding large compensation by utilization of their experience and ideas, although nothing of a patentable nature is involved. The plaintiffs herein appear to me to have occupied a similar position. They are entitled to the commissions provided by the contract on the covered production subsequent to September

23, 1943. The judgment should provide for such an accounting.

4. Counsel for plaintiffs will tender for entry judgment in accordance with the foregoing findings and conclusions.